**BROADCAST ARTS PRODUCTIONS, INC., Stephen Oakes and Peter Rosenthal, Plaintiffs,**

v.

**SCREEN ACTORS GUILD, INC., Defendant.**

No. 87 Civ. 7627 (PKL).

United States District Court, S.D. New York.

Nov. 20, 1987.

Loeb and Loeb and Hess, New York City (Charles H. Miller, Alan E. Marder, of counsel), for plaintiffs.

Shea & Gould, New York City (David Alter, Barry N. Saltzman, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge:

On October 27, 1987, Hon. Milton Pollack, United States District Judge of this Court, ordered that the parties in this action show cause on November 10, 1987, why a preliminary injunction should not be issued, pursuant to Fed.R.Civ.P. 65(a), enjoining defendant from proceeding with an arbitration commenced by defendant against plaintiff before the American Arbitration Association, pursuant to a Demand for Arbitration dated October 5, 1987, and/or why an order should not be issued staying the arbitration. Judge Pollack further issued a temporary restraining order staying the arbitration proceedings "until further court order". Pursuant to Fed.R. Civ.P. 65(b), that temporary restraining order was effective for a maximum of ten business days, through November 10, 1987. Defendants filed a cross-motion seeking, *inter alia*, an order compelling plaintiffs to arbitrate.

This case was originally assigned to Judge Louis L. Stanton [1], who recused himself on November 10, 1987. This matter was then reassigned to this Court, and a hearing was held on November 17, 1987. During the hearing, this Court, pursuant to Fed.R.Civ.P. 65(b), extended the temporary restraining order for 10 more days, through November 20, 1987.

## FINDINGS OF FACT

Defendant, the Screen Actors Guild (the "Guild"), is a labor organization incorporated in California, with offices at 1700 Broadway, New York, New York. The Guild represents performers in the film, television and commercial industries under various collective bargaining agreements. Program producers wishing to employ Guild performers must agree to be bound

---

1. Prior to assignment to Judge Stanton, Judge Pierre N. Leval declined to treat this case as related to *Broadcast Arts Productions, Inc. v. Pee Wee Pictures, Inc., et al.,* 86 Civ. 9979 (PNL).

by the Guild's master multi-employer collective bargaining agreement; this collective bargaining agreement can in turn be modified by any side letters between a particular employer and the Guild.

In September 1986, plaintiffs Broadcast Arts Productions Inc., Stephen Oakes, and Peter Rosenthal (collectively "BAP"), signed a Guild collective bargaining agreement (the "Labor Agreement"), effective through June 30, 1989.[2] Among other matters, the Labor Agreement covers performers employed by BAP in the production of the first thirteen episodes of a television program entitled "Pee Wee's Playhouse." The Labor Agreement expressly requires BAP to make specified residual wage payments to the Guild, on the performers' behalf, for each rerun of a television program; imposes specified late fees for failure to make timely residual payments; and sets forth welfare and pension contributions to be made by BAP on the performers' behalf.

BAP and the Guild each signed a statement, dated September 12, 1986, duly affixed with a Screen Actors Guild stamp (see Affidavit of Barry N. Saltzman, Esq., Exhibit 1), which provides:

It is agreed that the provisions with respect to arbitration severally contained in each of the following agreements; The Producers-Screen Actors Guild Codified Basic Agreement of 1967 and all supplements and amendments thereafter governing that Agreement and the Screen Actors Guild Television Agreement, shall be stricken from each of the said agreements and that in lieu thereof the following shall be substituted in each of said agreements and become part thereof:

"Any and all disputes of every kind and nature whatsoever between any Producer and the Guild or between any Producer and any individual player arising out of or in relation to this agreement, or arising out of or in relation to any individual contract of employment or engagement entered into between any Producer and player, including any dispute as to whether any Producer became a party to this Agreement and any dispute as to whether a Producer entered into an individual contract of employment or engagement with a player shall be submitted to arbitration under the rules then prevailing of the Voluntary Labor Arbitration Tribunal of the American Arbitration Association, it being the agreement of the parties that such arbitration shall proceed under and be governed by the applicable laws of the State of New York, and that the award duly made as the result of such arbitration shall be final and binding and that judgement [sic] may be entered thereon in any court having jurisdiction. The costs of any such arbitration, except counsel and witnesses' fees, shall be borne equally by the parties."

BAP claims that the program "Pee Wee's Playhouse" was produced by both BAP and another entity called Pee Wee Pictures, Inc. ("Pictures"). However, the Guild claims it never was and is not now a party to any agreement, arrangement or contract between BAP and Pictures. Nor was Pictures a party to the Labor Agreement entered into by BAP and the Guild.

The Guild asserts that it became aware, sometime around early 1987, that the first thirteen episodes of "Pee Wee's Playhouse" had been rerun several times, but that BAP had not made the residual payments to the Guild required by the Labor Agreement. The Guild served BAP with a statement of claim on April 3, 1987, but no residual payments for the reruns have ever been made by BAP.

Several months later, additional episodes of "Pee Wee's Playhouse" were to be produced, apparently by Pictures. The Guild, however, declined to allow its members to

---

**2.** The "Labor Agreement" is actually a set of collective bargaining agreements, as amended and renewed through September 1986, to which BAP became bound as party-producer. These agreements include Producer-Screen Actors Guild Television Agreements of 1977, 1980, 1983, and 1986 (the "Television Agreement"), the 1983 and 1986 New York Extra Players Agreements, various adherence letters, and a special contract letter dated July 3, 1986, from Joseph M. Santi to Marc Chamlin.

work on a television production where certain earlier episode reruns remained the subject of unpaid residuals. On or about July 1, 1987, Pictures and the Guild entered into an agreement (the "Guild/Pictures Agreement") (Affidavit of Barry N. Saltzman, Esq., Exhibit 2), under the terms of which Pictures agreed to advance to the Guild residual payments and benefit contributions that the Guild claimed were owed by BAP on the first thirteen episodes. BAP and the Guild disagree as to whether the advances by Pictures covered the full amount of monies owed by BAP to the Guild.

The Guild/Pictures Agreement appears to require the Guild to pursue arbitration against BAP to collect any unpaid residuals and other fees owed to the Guild; the Guild Pictures Agreement also appears to provide that all sums collected by the Guild in such arbitration must be paid to Pictures until Pictures has been repaid for its advances to the Guild. Paragraph 4 of the Guild/Pictures Agreement provides:

SAG [the Guild] shall promptly file and diligently prosecute a grievance and arbitration against Arts to recover the First Two Residuals, the First Two LP/LD's, the Third Residuals and, if SAG so elects, any costs of collection which SAG is entitled to recover (but SAG shall not seek to recover any other sums with respect to the First Two Residuals, the Third Residuals or the late payment thereof). If SAG obtains a favorable arbitration award (the "Award"), SAG shall diligently pursue the full and prompt collection thereof (including without limitation the entry of judgment thereon and the attachment of assets). Pictures shall be entitled to recoup the Advances out of that portion of the Award representing the First Two Residuals and/or the Third Residuals (the "Residuals Portion of the Award"). Any portion of the Award collected from Arts shall be deemed to represent the Residuals portion of the Award until Pictures has recouped the Advances in full. In addition, Pictures shall be subrogated to all rights and remedies which SAG might have under the SAG Agreement [the Labor Agreement] or otherwise, at law or in equity, with respect to the First Two Residuals, the Third Residuals and/or the Residuals Portion of the Award. Except as herein provided, the Advances shall be non-refundable by SAG, or performers represented by SAG, to Pictures.

During this period, litigation was already pending between Pictures and BAP with respect to the production of "Pee Wee's Playhouse". In December 1986, BAP had commenced an action in the Southern District of New York, before Judge Leval, entitled *Broadcast Arts Productions, Inc. v. Pee Wee Pictures, Inc., et al.*, 86 Civ. 9979 (PNL). That action is still pending. In that action, to date, BAP has asserted six claims for relief, and Pictures has asserted five counterclaims against BAP. The fifth counterclaim ("Counterclaim 5") in Pictures' Amended Answer to Amended Complaint dated June 19, 1987 (Affidavit of Marc Chamlin, Esq., Exhibit 3), alleges that BAP breached its contract with Pictures, dated May 14, 1986, by failing to pay the Guild the residuals due from the production of "Pee Wee's Playhouse". Apparently, by that counterclaim, Pictures seeks to recover the sums it advanced to the Guild. Paragraph 96 of Pictures Amended Answer of June 19 states:

In the event that such talent, union representatives or suppliers seek and recover or receive, by judgment or direct payment, sums from the defendants for obligations incurred by the plaintiff under the May 14, 1986 agreement, then such of the defendants as make such payments shall be entitled to payment from and judgment over against the plaintiff.

In response to Counterclaim 5, BAP has asserted that Pictures' numerous prior material breaches, and repudiation, of the May 14, 1986, BAP/Pictures contract relieve BAP of any contractual obligation to reimburse Pictures for any advances to the Guild.

On October 5, 1987, the Guild served upon BAP a Demand for Arbitration and filed that demand with the American Arbitration Association. On October 14, 1987,

the American Arbitration Association accepted jurisdiction of the arbitration.

On October 27, 1987, however, Judge Pollack granted BAP's application for an order temporarily restraining the Guild from arbitrating its claims against BAP.

## DISCUSSION

█ The standard for determining whether a preliminary injunction should be granted, pursuant to Fed.R.Civ.P. 65, is well established:

> A preliminary injunction may only issue when the moving party has shown (a) irreparable harm; and (b) either (i) a likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits to be a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief.

*Inverness Corp. v. Whitehall Laboratories*, 819 F.2d 48, 50 (2d Cir.1987) (per curiam), *citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

Because plaintiffs have failed to show either a likelihood of success on the merits or sufficiently serious questions going to the merits to be a fair ground for litigation, plaintiffs' motion for a preliminary injunction is denied.

### A. *Are the parties required to arbitrate?*

█ The Court of Appeals, in *Concourse Village v. Local 32E Service Employees International Union*, 822 F.2d 302 (2d Cir. 1987), recently summarized the well-settled principles to be applied by a district court when determining whether a collective bargaining agreement creates a duty to arbitrate a specific dispute. As Judge Pierce wrote for the Court of Appeals:

> Parties to a contract must submit a dispute to arbitration only when they have contracted to do so. *A.T. & T. Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *Rochdale*

*Village, Inc. v. Public Service Employees Union*, 605 F.2d 1290, 1294 (2d Cir. 1979). The determination of whether a collective bargaining agreement creates a duty to arbitrate a specific dispute is a matter to be resolved by a court, not the arbitrator, in the first instance. *A.T. & T. Technologies*, 106 S.Ct. at 1420; *Butchers, Food Handlers and Allied Workers Union v. Hebrew National Kosher Foods, Inc.*, 818 F.2d 283, 286 (2d Cir.1987); *Transit Mix Concrete Corp. v. Local Union No. 282*, 809 F.2d 963, 967 (2d Cir.1987); *Rochdale Village*, 605 F.2d at 1294. We note however, that our scope of review is quite limited because, in determining whether a contract contains a clause requiring the parties to submit to arbitration, all doubts must be resolved in favor of arbitrability. *A.T. & T. Technologies*, 106 S.Ct. at 1419 ("there is a presumption of arbitrability"); *Warrior & Gulf*, 363 U.S. at 583, 80 S.Ct. at 1353 ("doubts should be resolved in favor of coverage.") Indeed, unless it can be said "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," the dispute should be submitted to arbitration. *Id.* at 582–83, 80 S.Ct. at 1353.

*Concourse Village, supra*, 822 F.2d at 304.

Moreover, in determining whether a dispute should be submitted to arbitration, a court "is not to rule on the potential merits of the underlying claims." *A.T. & T. Technologies*, 106 S.Ct. at 1419. *See also Concourse Village*, 822 F.2d at 304. As the Second Circuit recently explained:

> The law has long been clear that where the parties have contracted to resolve their disputes by arbitration, a court asked to enforce that agreement should not weigh the merits of a claim that the agreement has been violated. The point has been driven home many times by the Supreme Court and by this court. Even if it appears to the court that the claim is frivolous, a union's assertion that an employer has violated the labor agreement should be decided by the arbitrator not by the court, because "[t]he agreement is

to submit all grievances to arbitration, not merely those which the court will deem meritorious." The reasons are simple and straightforward. The parties have agreed that an arbitrator should determine the merits of such claims and it is national policy to encourage resolution of disputes between management and labor by such peaceful means. In this by now traditional analysis, a court should first examine the scope of the arbitration clause to see if it is the broad one generally in use governing "all disputes" as to the meaning, application or compliance with the collective bargaining agreement, or is a narrower version which may exclude particular subjects from arbitration. The court must then determine whether the Union has made a claim that "on its fact is governed by the contract." If it has and if the arbitration clause is broad, then the court should order arbitration.

*Emery Air Freight Corp. v. Local 295, I.B.T.,* 786 F.2d 93, 96–97 (2d Cir.1986) (citations omitted).

In the present case, the signed statement of September 12, 1986 (Affidavit of Barry N. Saltzman, Esq., Exhibit 1), makes clear that, with respect to the Labor Agreement, the parties will arbitrate *"[a]ny and all disputes of every kind and nature whatsoever between any Producer and the Guild."* Neither party disagrees that this broad arbitration clause continues to apply to disputes arising under the Labor Agreement between BAP and the Guild. Thus, the only relevant issue for this Court is whether the claim which the Guild seeks to arbitrate is, on its face, governed by the contract. *See Emery Air Freight,* 786 F.2d at 96–97.

It is clear that the claim which the Guild seeks to arbitrate is, on its face, governed by the Labor Agreement. As noted above, the Labor Agreement expressly required BAP to make specified residual wage payments to the Guild for each rerun of a television program. The Labor Agreement also imposes specified late fees for failure to make timely residual payments, and sets forth welfare and pension contributions to be made by BAP on the performers' behalf.

The Guild seeks arbitration for the very purpose of determining whether BAP is liable for failing to make these required payments for certain reruns of "Pee Wee's Playhouse."

BAP claims that because Pictures may have advanced to the Guild an amount equal to the value of the claim which the Guild seeks to arbitrate, and because the Guild/Pictures agreement specifically requires the Guild to pursue that arbitration, the real dispute remaining involves Pictures and BAP, rather than the Guild and BAP. This argument lacks merit. In fact, the real issue to be arbitrated is whether BAP is liable to the Guild for failure to make certain payments required by the Labor Agreement. BAP claims that in the action before Judge Leval, Pictures' Counterclaim 5 asserts that BAP breached a contract *with Pictures* by failing to make payments to the Guild; however, to the extent that BAP may be liable to Pictures for breach of contract, that counterclaim states a cause of action distinct from any claim the Guild might have against BAP under the terms of the Labor Agreement. Even if Pictures, in the action pending before Judge Leval, seeks reimbursement from BAP for advances that it made to the Guild, the Guild can seek a separate determination of whether BAP indeed owes payments to the Guild—an issue governed by the terms of the Labor Agreement.

Moreover, plaintiffs have not shown that the Guild has in any way lost its right to arbitrate its claim against BAP under the terms of the Labor Agreement. Although the Guild did accept advance payments from Pictures to cover payments which the Guild believes should have been made by BAP, the Guild/Pictures Agreement itself contemplates that the Guild will pursue arbitration to collect the payments BAP allegedly owes under the Labor Agreement. Pictures, in mid–1987, wanted to produce new episodes of "Pee Wee's Playhouse"—apparently to allow Guild members to perform in those new episodes, Pictures advanced to the Guild funds which the Guild said it was owed by BAP. In effect, Pictures either took a risk, or acted

on the assumption, that the Guild would be able to collect through arbitration the money owed to it by BAP—only then would the Guild reimburse Pictures for the funds advanced. While Paragraph 4 of the Guild/Pictures agreement does state that "[e]xcept as herein provided, the Advances shall be non-refundable by SAG [the Guild], or performers represented by SAG, to Pictures," the advances must be reimbursed by sums collected through arbitration— nothing in the language of Paragraph 4 shows that the Guild forfeited any rights it may have under the Labor Agreement to arbitrate any disputes with BAP concerning the Labor Agreement.

In determining whether arbitration will be enjoined, this Court must not consider whether, for example, the Guild should be estopped from collecting any payments from BAP. Such considerations would require this Court to rule on the potential merits of the underlying claim to be arbitrated. Indeed, all potential affirmative defenses or arguments on the merits which BAP might make in response to the Guild's claim must be raised before an arbitrator, and cannot be the basis for an injunction by this Court to stay arbitration proceedings.[3]

Plaintiffs thus have shown neither a likelihood of success on the merits of their claim that arbitration should be enjoined, nor have plaintiffs raised sufficiently serious questions going to the merits to be a fair ground for litigation. Therefore, plaintiffs' motion for a preliminary injunction must be denied. *See Inverness Corp. v. Whitehall Laboratories*, 819 F.2d 48, 50 (2d Cir.1987).

**B.** *Irreparable Harm*

■ Because plaintiffs have not shown a likelihood of success on the merits or sufficiently serious questions going to the merits, it is not necessary to determine whether plaintiffs would be irreparably harmed by this Court's denial of plaintiffs' motion for a preliminary injunction. However, in any event, plaintiffs have not demonstrated the existence of any irreparable harm. At oral argument, plaintiffs' attorney stated that plaintiffs' would be irreparably harmed in three ways: *first,* BAP would be required to arbitrate a dispute in a forum which it did not choose for dispute resolution; *second,* BAP would be subject to inconsistent rulings in the action pending before Judge Leval and in the arbitration sought by the Guild; and *third,* BAP might be collaterally estopped in a forum it did not choose for dispute resolution. None of these three arguments demonstrates harm sufficient to justify a preliminary injunction in this case. As to the *first* and *third* arguments, the Labor Agreement makes clear that BAP did indeed agree to resolve all disputes concerning the Labor Agreement by arbitration, and the arbitration sought by the Guild clearly involves obligations under the terms of the Labor Agreement which the Guild claims BAP did not fulfill. As to the *second* argument, BAP has not demonstrated that Pictures' counterclaim before Judge Leval concerns the Guild's rights under the Labor Agreement; rather, that counterclaim only alleges that by failing to make payments to the Guild, BAP breached duties it owed to Pictures. The only judgment requested on the Pictures counterclaim is for "such sums as are recovered or received by third parties which are the obligation of the plaintiffs under the May 14, 1986 agreement [between BAP and Pictures]." Indeed, the counterclaim itself says recovery should be made by Pictures from BAP "in the event that such talent, union representatives or suppliers seek and recover or receive, by judgment or direct payment, sums from the defendants for obligations incurred by the plaintiff under the May 14, 1986 agreement." [Affidavit of Marc Chamlin, Esq., Exhibit 3].

3. *See, e.g., Local 370, Operating Engineers v. Morrison-Knudsen Co.,* 786 F.2d 1356 (9th Cir. 1986) (employer's defenses of arbitration based on the doctrines of waiver, equitable estoppel and mootness are to be determined by the arbitrator); *Beer, Soft Drink, etc., Local Union No. 744 v. Metropolitan Distributors Inc.,* 763 F.2d 300 (7th Cir.1985); *Inner City Broadcasting Corp. v. American Federation of Television and Radio Artists,* 586 F.Supp. 556 (S.D.N.Y.1984) (motion to stay arbitration denied and motion to compel arbitration granted because employer's defense of waiver was to be raised before an arbitrator). *Cf. ABC, Inc. v. Ali,* 434 F.Supp. 1108 (S.D.N.Y.), *aff'd w/o opinion,* 573 F.2d 1287 (2d Cir.1977).

As the Second Circuit has explained, "as the preferred method for resolving labor disputes, arbitration by itself imposes no [irreparable harm] to the resisting party, except perhaps in 'extraordinarily rare' circumstances, which we need not try here to imagine." *Emery Air Freight*, 786 F.2d at 100. While the circumstances of the present case are interesting and perhaps uncommon, BAP has not shown that any circumstance is of the "extraordinarily rare" type that results in irreparable injury.

## CONCLUSION

Therefore, plaintiffs' motion for a preliminary injunction and for an order staying arbitration is hereby denied.

Defendant's cross-motion for an order denying plaintiffs' motion for a preliminary injunction and dismissing the complaint is hereby granted. Defendant's cross-motion for an order compelling plaintiffs to raise their defenses, if any, at arbitration, is hereby granted, and plaintiffs are hereby ordered to submit to the arbitration demanded by defendant on October 5, 1987, and over which the American Arbitration Association accepted jurisdiction on October 14, 1987. Defendant's cross-motion for an order awarding defendant full reimbursement of its expenses in these proceedings is denied.

SO ORDERED: